# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

LAJUANA WILLIAMS,           )
                            )
            Plaintiff,      )
                            )
vs.                         )     Case No. 4:11CV00057 AGF
                            )
MICHAEL J. ASTRUE,          )
Commissioner of Social Security, )
                            )
            Defendant.      )

## MEMORANDUM and ORDER

This action is before the Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Lajuana Williams was not disabled and, thus, not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434 or Supplemental Security Income based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381.  For the reasons set forth below, the decision of the Commissioner shall be reversed and remanded for proceedings consistent with this opinion.

Plaintiff, who was born on July 5, 1960, filed her applications for benefits on February 20, 2008, at the age of 47, alleging a disability onset date of November 15, 2007, due to chronic pain in her lower back, knees, feet, legs and hands.  After Plaintiff's application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and a hearing was held on July 9, 2009.  Plaintiff and a vocational expert ("VE")  testified at the hearing.  By decision dated

August 11, 2009, the ALJ found that Plaintiff had a residual functional capacity ("RFC")

which would allow her to perform sedentary work and was not disabled under the Act.

Plaintiff's request for review by the Appeals Council of the Social Security

Administration was denied on December 3, 2010.  Plaintiff has thus exhausted all

administrative remedies and the ALJ's decision stands as the final agency action now

under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in

the record.  Specifically, Plaintiff argues that the ALJ failed to give proper weight to the

opinion of a treating physician, Dr. Sateia; failed to properly consider diabetic neuropathy

as one of Plaintiff's severe medical impairments; and inaccurately summarized the

testimony of the VE.  Plaintiff asks that the ALJ's decision be reversed or, in the

alternative, remanded for further consideration.

## BACKGROUND

### Work History and Application Forms

Plaintiff filed applications for Title II and/or Title XVI disability benefits on

January 21, 2003, and November 2, 2004, alleging earlier onset dates than the onset date

of the applications at issue.  Both were denied at the initial determination level and

Plaintiff did not further pursue them.  (Tr. 13).

In the Work History Report submitted with her application for benefits, Plaintiff

wrote that she was a cashier from September 2000 until January 2003.  In the sixteen

2

years prior to working as a cashier, Plaintiff had worked either as a cleaner or clerk.  Her tasks as a clerk included filing and entering insurance claims into the computer and required her to sit between three and seven hours a day.  Plaintiff's tasks as a cleaner included vacuuming, dusting, wiping kitchen counters, pulling the trash and cleaning restrooms, patients' rooms, and the nurses' station.  As a cleaner, Plaintiff indicated that she was required to walk between two and four hours a day, stand two hours a day, climb two hours a day, frequently lift less than 10 pounds, and handle big objects for two hours a day or crouch for two hours.  At the hearing, Plaintiff testified that she was self-employed as a daycare provider from 2003-2006 during which time she cared for three children.

**Medical Record**

In February 2002, Plaintiff was diagnosed with glaucoma and in 2007 had laser iridotomy.  (Tr. 303, 305, 310.)  Hospital records indicate that Plaintiff experienced a heart attack in September 2002.  (Tr. 38, 231.)  At that time, a medical examination of Plaintiff revealed a history of hypertension, diabetes and obesity as well as coronary artery disease and dyslipidemia.  (Tr. 235-36.)  In 2003, Plaintiff underwent stenting as a result of the heart attack.  (Tr. 12, 225-30.)

In July 2007, Dr. Chandra Ho of the Barnes-Jewish outpatient clinic,[1] saw Plaintiff

---

[1]   During the time period relevant to this application, Plaintiff was seen by physicians affiliated with the Internal Medicine Clinic, the Renal Division, and the Washington University Physicians Clinic at the Washington University School of

3

and noted that her medical conditions, including coronary artery disease, hypertension, hyperlipidemia, and diabetes, were stable or controlled with medication.  (Tr. 280-84.) Plaintiff reported leg pain, which Dr. Ho at that time attributed to "likely diabetic neuropathic pain."  (Tr. 281.)

On January 28, 2008, Daniel Coyne, M.D., and Seth Goldberg, M.D., of the Barnes-Jewish outpatient clinic, diagnosed Plaintiff with stage IV chronic kidney disease based on Plaintiff's MDRD creatinine clearance of 28.  Plaintiff was also diagnosed with renal insufficiency (renal osteodystophy) and anemia but a renal sonogram performed on January 31, 2008 was normal.  (Tr. 257-259, 260, 271, 290.)  In his March 28, 2008 examination of Plaintiff, Dr. Coyne noted trace edema in addition to chronic kidney disease, hypertension, anemia, and diabetes.  (Tr. 494.)

On April 11, 2008, Joanne Moses, a non-medical consultant and disability examiner with the Social Security Administration, recorded Plaintiff's exertional abilities as follows: occasional lifting of ten pounds; frequent lifting of less than ten pounds; standing and/or walking at least two hours in an eight-hour day; and sitting about six hours in an eight-hour day.  (Tr. 58.)

In June of 2008, Plaintiff experienced various symptoms of congestive heart

_____

Medicine.  In his decision, the ALJ refers to all of these clinics as the "Barnes-Jewish outpatient clinic" and collectively, to the doctors who treated her there as the "Barnes-Jewish doctors." (Tr. 14).  In the interest of consistency, the Court also will use these designations as the parties raise no objection to them.

4

failure and was seen at the Barnes-Jewish outpatient clinic. (Tr. 432).  During that visit,

William Clutter, M.D., recorded 2+ pitting edema in the lower extremities.  (Tr. 436).  On

June 19, 2008, Dr. Ho examined Plaintiff at the same clinic and concluded that her

diabetes, coronary artery disease, and hypertension were either stable or controlled.  (Tr.

427.)

On July 28, 2008, Heather Sateia, M.D., saw Plaintiff at the Barnes-Jewish

outpatient clinic.  Plaintiff told Dr. Sateia that she had been taking Wellbutrin for

depression since 2002, but that its effectiveness had diminished.  Dr. Sateia prescribed

medication for her depression.  (Tr. 417.)

On August 11, 2008, Dr. Coyne again noted trace edema 1+ of the lower

extremities as well as chronic kidney disease, anemia, and diabetes.  (Tr. 484-85.)  Dr.

Sateia saw Plaintiff for groin pain, skin abscesses, and insomnia on November 26, 2008.

(Tr. 395-96.)

Two months later, on January 29, 2009, Katherine Henderson, M.D., of the

Barnes-Jewish outpatient clinic examined Plaintiff for back pain.  During this visit, Dr.

Henderson also increased Plaintiff's dosage of gabapentin, a medication for neuropathy.

(Tr. 370.)

On February 1, 2009, Dr. Sateia saw Plaintiff for pneumonia and back pain.  (Tr.

328-30, 363-64.)  On February 16, 2009, Dr. Coyne noted trace edema, chronic kidney

disease stage III, and anemia.  He also decreased Plaintiff's dosage of gabapentin

prescribed for neuropathy.  (Tr. 480.)

On May 6, 2009, Dr. Sateia saw Plaintiff for knee pain and ordered an x-ray which revealed mild to moderate right knee tricompartmental osteoarthritis.  Dr. Sateia observed that the gabapentin had helped Plaintiff's peripheral neuropathy.  (Tr. 507, 512-14.)

On May 21, 2009, Dr. Sateia responded to a Physical Residual Functional Capacity Questionnaire (PRFCQ), sent to her by Plaintiff's attorney, and stated that Plaintiff's impairments were severe enough to interfere on an occasional basis with her ability to concentrate and perform even simple work tasks.  (Tr. 463-65, 513.)  Dr. Sateia noted symptoms of "pain, shortness of breath (occasionally), [and] chest pain" as well as bilateral knee pain and fatigue from Metoprolol.  She also wrote that Plaintiff's impairments had lasted or could be expected to last at least twelve months.  Further, Dr. Sateia noted that Plaintiff would likely need to take two ten-minute breaks per day, that she could occasionally lift less than ten pounds, rarely lift ten pounds, and never carry as much as twenty pounds.  Dr. Sateia opined that, during an eight hour work day, Plaintiff could stand for less than two hours, and sit for at least six hours, and that Plaintiff would likely be absent from work about four days per month due to her medical issues.  (Tr. 464-67.)

**Evidentiary Hearing of July 9, 2009  (Tr. 21-56)**

Plaintiff, who was represented by counsel, testified that she was 49 years old, and had completed high school.  From 2003 to 2006, Plaintiff was self-employed as a daycare

provider during which time she cared for three children.  She testified that she

occasionally lifted the children, including the heaviest one who weighed eighteen pounds.

Plaintiff testified that from 2003 to 2006 she also was employed as a cashier.  She

testified that she had someone else do the lifting duties which were part of this job.

Plaintiff testified that after her heart attack in 2002, she went back to work as a cashier

but could no longer do the job because her body still hurt, she got dizzy and almost passed

out.

Plaintiff testified that prior to working as a cashier she had worked for several

cleaning companies and as a hospital housekeeper.  She explained that she was fired from

the hospital for using profanity in the cafeteria and that everyone was fired from one of

the cleaning company jobs after something was stolen from a building where they were

working.

Plaintiff testified that she had not applied for any jobs since 2007 because she

knew she could not do them because her legs hurt if she walked or stood too long and her

lower back hurt if she sat too long.  She could not remember anything specific that

happened on the date of disability onset, November 15, 2007.

With respect to daily activities, Plaintiff stated that she usually got up around 9:30

or 10:00 at which time she took her medicine, including her insulin shot, and made

herself something to eat.  Afterward, Plaintiff said she washed the dishes and straightened

up her house which has a living room, bedroom, bathroom and a kitchen.  Plaintiff

7

testified that when she thoroughly cleans her house, it takes her six hours.  After she is done cleaning, Plaintiff testified that she has to sit down and rest for an hour or hour and a half, and then she makes dinner.

At the hearing, Plaintiff explained that her daughter and best friend come to visit her.  She testified that she is not active in any clubs, organizations or a church but that she watches a lot of TV and does puzzle books sometimes.  Plaintiff stated that she does her own laundry, vacuuming, mopping, sweeping, and grocery shopping.  Plaintiff testified that in the evenings she usually stays at home.  On the weekends, Plaintiff stated she goes to the nail shop if her daughter is going and when it is nice outside, Plaintiff stated that she sits outside.

Plaintiff testified that if she stands too long in the shower, her legs begin to hurt and she has to get out.  Plaintiff testified that she smokes less than a pack of cigarettes a day and drinks socially.  She stated that she never had problems drinking or with drugs.

Plaintiff explained that she currently took two medications, Ranitidine and Modapine, to control her high blood pressure.  She also took Metoprolol because of a heart attack in 2002 that kept her in the hospital for four days.  She stated that doctors told her that sixty percent of her heart was damaged and she needed to eliminate stress to prevent another heart attack.  Plaintiff stated that she had stents put in and that as a result, she sometimes had chest pain.  Plaintiff explained that if she walked about a block and a half, she would have to sit down because she had problems with shortness of breath.

8

With respect to other medication, Plaintiff testified she took Loratadine for her sinus problems, namely watery eyes and drying itch which were aggravated by grass, not cigarette smoke. Plaintiff explained that she took Lipitor to control her cholesterol and Thoracymide to control the water retention in her feet and legs. Plaintiff stated that she took Plavix for a blood thinner, Lycinopril for her blood pressure, and gabapentin for poor circulation. She testified that she also took Imdur but could not remember why she took it. Plaintiff further testified that she took Baclofin because of the cramps in her leg, feet, and lower back. To control the pain in her legs, Plaintiff took Tramadol. To control her diabetes, Plaintiff testified that she took insulin shots and, as a result, had poor circulation in her hands. Plaintiff took Paraselphage for anemia, Citalopram for depression and docusate sodium for constipation. Plaintiff explained that her doctor had told her that if her kidneys deteriorated to a creatinine level of 4.0 from their current level at 1.0, she would have to receive dialysis. Plaintiff also noted that she was diagnosed with glaucoma about two years ago.

Plaintiff testified to being depressed. She stated that she cried about three times a week and took medicine for the depression. Plaintiff's depression did not include suicidal thoughts nor had she been in a mental hospital or under psychiatric care for her depression. Plaintiff noted that her concentration was not good because her mind sometimes wandered off, but she was able to watch a two hour movie.

Plaintiff testified that she was able to stand up for ten minutes, walk about a block

9

and a half, and lift less than five pounds.  She further stated that no bending, stooping, crouching, kneeling or crawling was possible for her because her knees hurt too much.

In response to questions from her attorney, Plaintiff testified that her right knee hurt and that an x-ray showed she had osteoarthritis in that knee.  Plaintiff explained that she experienced swelling in her right knee when it rained and she needed to elevate her knee as a result of the swelling.  Plaintiff noted that after her heart attack, the doctors told her that she could not lift anything over ten pounds and that when she did lift heavy things, there was a pull on the left side of her heart.  Plaintiff testified to feeling fatigued and that she took about two naps per day.  She explained that she could not sit through a two hour movie without having to move or get up.

The VE testified that Plaintiff had worked as a cashier, janitor, and as a daycare provider.  The ALJ asked the VE to consider an individual of the same age, education, and vocational background as Plaintiff who was limited to sedentary work; to occasional lifting, carrying, pushing, or pulling of ten pounds and less than ten pounds frequently; to occasional climbing of stairs and ramps, balancing, stooping, kneeling, crouching, and crawling; who could sit for six out of eight hours and walk for two out of eight hours; and who was unable to climb ropes, ladders, and scaffolds, or unprotected heights.  The VE testified that such an individual could not perform any of Plaintiff's past work, but could perform the jobs of a security guard or cashier.  The VE also testified that if, for example, Plaintiff had to take a blood thinner, she could perform the jobs of security guard monitor

10

or cashier without any limitations.  The VE testified that all such jobs would be precluded if the individual needed a break as a result of pain-induced problems and had attention and concentration problems ranging from 6% to 33% of an eight-hour workday.  In addition, the VE testified that an individual who had to miss approximately four days of work per month as a result of impairments or treatment, would be unemployable.

**ALJ's Decision of August 11,  2009 (Tr. 11-19)**

The ALJ found that Plaintiff had not engaged in substantial gainful activity since at least November 15, 2007, her alleged onset date.  The ALJ then assessed Plaintiff's credibility and stated that she had a "good and steady work record" up to and including her alleged onset date of disability, but noted that a work record is only one factor to be considered when assessing credibility.

The ALJ found that the medical evidence established that Plaintiff had one or more severe impairments, but no impairment or combination of impairments that equaled or exceeded in severity the requirements of any impairments listed in the Commissioner's regulations.  The ALJ then noted that Plaintiff's weight, always well over 200 pounds, did not meet or exceed the 236 pounds required for a woman of her height, 61 inches, to consider her for disability due to obesity.  While noting that Plaintiff's weight somewhat diminished her ordinary mobility and stamina, the ALJ concluded that there was no credible evidence that her weight, either alone or in combination with other medically established impairments, reduced her overall functional abilities so as to alter his RFC

11

determination.

The ALJ summarized the medical record and concluded that due to her combined impairments, including limited mobility and stamina secondary to sheer obesity, Plaintiff was unable to perform her past relevant work.  The ALJ further determined that Plaintiff had the RFC to perform sedentary work[2] not requiring climbing of ropes, ladders, or scaffolds, and restricting her to no more than the occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching or crawling.

In support of the RFC, the ALJ stated that the capabilities and limitations he asked the VE to assume were "basically the ones established by the State Agency medical evaluators in April 2008 (Exhibit 1A)"[3] and "materially the same ones as those suggested, by Dr. Sateia in May 2009."[4]

_____

[2]      Sedentary work involves lifting no more than ten pounds at a time, occasionally lifting or carrying articles like docket files, ledgers, and small tools, and occasionally walking and standing.  20 C.F.R. § 404.1567(a).

"Occasionally" would generally total no more than about two hours of an eight-hour workday.  Sitting would generally total about six hours of an eight-hour workday.  Social Security Ruling ("SSR") 96-9p, 1996 WL 374185, at *6-7 (July 2, 1996).

[3]  Exhibit 1A (Tr. 57-62) is the Physical RFC Assessment completed by Joanne Moses, whose title is listed as "Counselor" on the Request for Medical Information (Tr. 293), and as "Disability Examiner-DDS3" on the Disability Determination and Transmittal Form.  (Tr.64- 65).  DDS or  Disability Determination Services is the network of  Social Security Administration (SSA) field offices and State agencies responsible for processing Social Security disability claims.

[4]      The ALJ refers here to a PRFCQ completed by Dr. Sateia in May 2009.  (Exh. 8F., Tr. 464-468).

12

The ALJ then found, on the basis of the VE's response to the hypothetical based upon these assumptions, that the Plaintiff could perform work as a security guard monitor and cashier, both jobs available in significant numbers in the regional and national economies.  The ALJ further noted the VE's testimony to the effect that Plaintiff would be "unemployable if she had the kind of break needs and frequency of work absences projected by Dr. Sateia in [the PRFCQ] or if Plaintiff's conditions would substantially interfere with her concentration 6-33% of a normal work day."  The ALJ then stated that he did not find the assumptions with respect to absences, breaks, and concentration and based upon Dr. Sateia's PRFCQ responses to be "valid or justified by the preponderance of the medical evidence and opinions in the record."

Noting that Dr. Sateia was not the only doctor at the Barnes-Jewish outpatient clinic[5] who had seen Plaintiff and that she had only recently begun treating Plaintiff, the ALJ nonetheless recognized that Dr. Sateia "might arguably be called a 'treating physician' whose opinion is normally entitled to great weight" under the Commissioner's regulations.  The ALJ found, however, that even if Dr. Sateia were a treating physician, her projections about Plaintiff's need for "unscheduled work breaks and absences is sheer speculation" and "inconsistent with the vast majority of the clinical treatment notes"

_____

[5]    The progress notes signed by Dr. Sateia indicate that they also were reviewed by an attending physician. This circumstance suggests that Dr. Sateia, although fully licensed, was in training as a resident at the Barnes-Jewish outpatient clinic when she treated Plaintiff.  (Tr. 365, 395-96, 417, 515).

13

showing Plaintiff's chronic conditions to be "stable with medications, only occasionally interrupted by an acute event . . . ."

With regard to daily physical and exertional limitations, the ALJ found Dr. Sateia's assessment credible and consistent with the preponderance of the medical evidence, but he found "no valid medical reason" for believing that Plaintiff's depression significantly limited her ability to work.  The ALJ opined that Dr. Sateia's assessment as to projected absences, work breaks, or interference with concentration was neither credible nor consistent with the preponderance of the medical evidence.

The ALJ explained that Plaintiff's diabetes, hypertension, hyperlipidemia, coronary artery disease, kidney disease with secondary anemia, and alleged glaucoma were all stable with medication, and that her osteoarthritis of the knee required use of a cane but was not diagnosed until May 2009 and did not, "even according to Dr. Sateia," preclude sedentary work.  The ALJ further stated that Plaintiff had not been referred for physical therapy to treat her pain and that nothing in the record indicated that she experienced any significant side effects from her medications.  The ALJ also noted that neither Dr. Sateia nor any other doctor who examined Plaintiff stated or implied that she was "disabled or incapacitated."

The ALJ further noted that the jobs identified by the VE "would probably accommodate" whatever specific nonexertional restrictions Dr. Sateia mentioned that were not contained in "the State Agency medical evaluators['] assessment in Exhibit 1A."

14

The ALJ opined that the jobs identified by the VE were "unskilled jobs not requiring much in the way of 'stress.'"

 The ALJ found that Plaintiff did not exemplify the signs typical of chronic, severe musculoskeletal pain nor did the medical evidence indicate an inability to "ambulate effectively or to perform fine and gross movements effectively on a sustained basis" due to an underlying musculoskeletal impairment.  Moreover, the ALJ opined that Plaintiff's own testimony indicated that her daily activities were "not all that restricted."

The ALJ concluded that despite medical evidence of depression, Plaintiff's abilities to think, understand, communicate, concentrate, get along with other people, and handle normal work stress were not notably impaired on any documented long-term basis. Nor was there documentation of any serious decline in her personal hygiene, daily activities, thought processes, memory, speech, or mood.  Plaintiff had never been described as suicidal or psychotic nor had she required a sustained course of mental health treatment.

The ALJ noted that at the evidentiary hearing, Plaintiff had exemplified no obvious signs of depression, anxiety, memory loss or mental disturbance.  Accordingly, the ALJ also found that the Plaintiff did not have any medically-established mental or mood disorder that would prevent her from doing any of the jobs indicated by the vocational expert which were consistent with Plaintiff's capabilities and limitations as established by the medical evidence.  The ALJ further concluded that there was no

15

evidence of Plaintiff having a mental impairment or combination of impairments listed in Sections 12.02-12.10 of Appendix I, pursuant to the mental impairment evaluation required by 20 CFR404.1520a and 416.902a.  Finally, the ALJ noted that Plaintiff  had no restrictions of mental activities or of maintaining social functioning and has no recorded instances of a deficiency in concentration, persistence or pace which amounted to an inability to complete work tasks in a timely fashion.  The ALJ, having determined that Plaintiff was unable to perform any of her past relevant work concluded, on the basis of the VE's testimony, that Plaintiff could perform the requirements of a security guard monitor and cashier and that those were jobs existing in significant numbers in the regional and national economies.

## DISCUSSION

## Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court "must review the entire administrative record to 'determine whether the ALJ's findings are supported by substantial evidence on the record as a whole.'"  *Johnson v. Astrue*,  628 F.3d 991, 992 (8th Cir.  2011) (quoting *Dolph v. Barnhart*, 308 F.3d 876, 877 (8th Cir.2002)).  The court "'may not reverse . . . merely because substantial evidence would support a contrary outcome.'  Substantial evidence is that which a 'reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (citations omitted); *see also Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (explaining that the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal by the reviewing court).

To be entitled to benefits, a claimant must demonstrate an inability to engage in substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability.  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the

Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

The claimant bears the burden of establishing a severe impairment, and if she does not have a severe impairment the claim is denied. If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in the Commissioner's regulations. If not, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work. If so, the claimant is not disabled. If she cannot perform her past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors -- age, education, and work experience. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).

A disability claimant's RFC is the most she can do despite her limitations. 20 C.F.R. § 404.1545(a)(1). In *McCoy v. Schweiker*, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Id.* at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records,

18

observations of treating physicians and others, and an individual's own description of his limitations.'" *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).  Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for making the RFC determination and for ensuring that there is "some medical evidence" regarding the claimant's "ability to function in the workplace" that supports the RFC determination. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, "the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." *Id.* (internal quotations omitted).

In this context, the Eighth Circuit has repeatedly recognized that a treating physician's opinion is entitled to "substantial weight." *Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010) (quoting *Heino v. Astrue*, 578 F.3d 873, 880 (8th Cir. 2009)).  The ALJ may, however, discount the statements of a treating physician if they are inconsistent with the opinions of other physicians, the claimant's testimony, or the overall record. *Teague v. Astrue*,  638 F.3d 611, 615 (8th Cir. 2011); *Medhaug v. Astrue*, 578 F.3d 805, 815-16 (8th Cir. 2009).  In addition, an ALJ may discount or even disregard the opinion of a treating physician, where "'other *medical* assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Wildman v. Astrue*, 596 F.3d

19

959, 964 (8th Cir. 2010) (emphasis supplied) (quoting *Goff v.Barnhart*, 421 F.3d 785,790 (8th Cir. 2005)).

In addition to the opinion of a treating physician, an ALJ also may give some weight to medical opinions derived from the evaluations of state agency "medical source" consultants.  Social Security Ruling ("SSR") 96–6p (approving consideration of "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of an individual's impairment(s)").  The Commissioners's regulations define a "medical source" as a licensed physician, psychologist, optometrist, podiatrist, or qualified speech pathologist is deemed a for purposes of such opinions.  20 C.F.R. § 404.1513.

Although an ALJ may rely upon the opinion of a non-treating or consultative "medical source," he may not give the same weight to the opinion of a non-medical, or lay, state agency evaluator.  Reliance on the opinion of non-medical state evaluator will not, without more, provide substantial evidence in support of an RFC.  *See, e.g., Dewey v. Astrue*, 509 F.3d 447, 449-50 (8th Cir. 2007); *Johnson v. Astrue*, No. 4:11CV597 CDP, 2012 WL 447391, at *11 (E.D. Mo. Feb.13, 2012); *Perkins v. Astrue*, No. 4:10CV 581 LMB, 2011 WL 4378165, at *15-16 (E.D. Mo. Sep. 20, 2011).  In addition to this restriction, the ALJ is prohibited from drawing his own medical inferences from the opinions of either treating or consultative "medical source" professionals.  *See Lauer*, 245 F.3d at 703; *see also Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000) ("[a]n administrative

20

law judge may not draw upon his own inferences from medical reports").

**The ALJ Failed to Properly Consider the Opinion of Dr. Sateia**

Plaintiff asserts that the ALJ failed to properly consider Dr. Sateia's opinion as expressed in the PRFCQ she completed in May, 2009.  (Ex. 8F.)  In addition, Plaintiff contends that the ALJ improperly substantiated the RFC by applying the rules appropriate for medical source opinions to the opinion of a non-medical state evaluator, and that in the absence of both opinions there is no substantial medical evidence to support the RFC.

The ALJ identified Dr. Sateia as a treating physician and found her opinion "credible and consistent with the preponderance of the medical evidence in regard to day-by-day physical and exertional capabilities and limitations, but not as to projected absence, excessive work breaks, or excessive concentration interference."  (Tr. 16.)  The ALJ provided no basis for discrediting the portion of Dr. Sateia's opinion relating to work-related functioning apart from calling it "sheer speculation" and "inconsistent with the preponderance of other medical evidence and opinions in the record."  (Tr. 15.)

Having accepted Dr. Sateia as a treating physician, the ALJ may not discredit a portion of her opinion without giving a good reason for doing so.  *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).  Here, apart from impermissibly drawing his own inferences from the medical record and opining that Plaintiff's impairments were "controlled on medication except for acute bouts," the ALJ failed to give such a reason. The ALJ did not identify any of the legitimate reasons for discrediting a treating

21

physician's opinion, such as a lack of clinical findings, the presence of more thorough medical assessments, or inconsistencies in Dr. Sateia's records, to support his rejection of her opinion. *See Wildman*, 596 F.3d at 964.

Moreover, the ALJ failed to articulate a valid distinction between the portion of Dr. Sateia's opinion he accepted and the portion he rejected. The accepted opinion and the rejected opinion are similar in scope, yet the ALJ nowhere explains how an opinion regarding "day-by-day physical and exertional capabilities and limitations" can be accepted as valid, but an opinion drawn from those "capabilities and limitations" regarding work-related functioning, rejected as "sheer speculation."

The ALJ labeled Dr. Sateia's discredited opinion "inconsistent with the preponderance of other medical evidence and opinions in the record," but aside from that opinion, the record contains no other medical evidence regarding work-related functioning.[6] The remaining evidence in the record regarding work-related functioning is the report of a non-medical state agency evaluator whom the ALJ mistakenly credited as a medical evaluator.

---

[6] Even if the medical record contained indications that other treating physicians had concluded that Plaintiff's diabetes, congestive heart failure and chronic kidney disease were controlled on medication, this would not be sufficient medical evidence to support the RFC. In similar situations, the Eighth Circuit has noted that a medical opinion that a claimant is "doing well," signifies an assessment for purposes of a course of treatment, but "has no necessary relation to a claimant's ability to work or to her work-related functional capacity." *See, e.g.*, *Hutsell v. Massanari*, 259 F. 3d 707, 712 (8th Cir. 2001); *Gude v. Sullivan*, 956 F.2d 791, 794 (8th Cir. 1992); *Fleshman v. Sullivan*, 933 F.2d 674, 676 (8th Cir. 1991).

Plaintiff relies on *Dewey v. Astrue* to support her assertion that the ALJ failed to fulfill his duty to assure that the RFC is supported by some medical evidence addressing the claimant's ability to function in the workplace, because he relied upon the report of a non-medical state agency evaluator, without more, to support his RFC. 509 F.3d at 448-49; *see also Lauer*, 245 F.3d at 703-04.

In *Dewey*, the Eighth Circuit reversed a denial of benefits where the ALJ relied upon the assessment of a non-medical state agency consultant in determining plaintiff's residual functional capacity. 509 F.3d at 448-50. In that case, as here, the ALJ explicitly credited a non-medical state evaluator's PRFCQ on the mistaken belief that it had been authored by a medical source. *Id.* at 449. The Eighth Circuit noted that the non-medical evaluator's assessment was less restrictive than that of the claimant's treating physician, and that the record was devoid of other medical source evidence related to work functioning. *Id.* In light of these circumstances, the Eighth Circuit held that reliance on the assessment was not harmless error, because it could not be said that the ALJ would inevitably have reached the same conclusion had he understood that the PRFCQ had not been completed by an acceptable medical source. *Id.* at 449–50.

Subsequently, courts have drawn distinctions and departed from this holding where a non-medical evaluator's opinion was the same or more restrictive than that of the treating physician, or where the record contained other medical opinions of sufficient clarity and relation to work-related functioning to support the RFC. *See, e.g.*, *Wyrick v.*

*Astrue*, No. 10–5055–CV–SW–ODS, 2011 WL 2680719, at *1 (W.D. Mo. Jul. 8, 2011);

*Greene v. Astrue*, No. 4:10CV837 CDP, 2011 WL 2472556, at *5 (E.D. Mo. Jun. 21,

2011).  In this case, however, the Court concludes that the principle set forth in *Dewey* is

applicable, and there are no factual distinctions to render it otherwise.

The Commissioner asserts that "even if the ALJ mistakenly relied"[7] upon the non-

medical state evaluator's report as a medical opinion, the ALJ would have reached the

same result because he characterized the limitations in his RFC as "materially the same

ones as those suggested by Dr. Sateia in May 2009."  (Tr. 15, 464-68.)  The limitations

"suggested by Dr. Sateia in May 2009" include the very restrictions related to absences,

breaks, and concentration that the ALJ rejected.  In relying on restrictions "materially the

same" as, but not identical to, Dr. Sateia's opinion at step four, the ALJ avoided adopting

the specific limitations that, at step five, would have counseled a finding that Plaintiff was

disabled.  In the absence of additional medical evidence supporting the ALJ's seemingly

result-oriented parsing of the work-related restrictions, the Court is unable to conclude

that the outcome here would have been the same without the ALJ's mistaken reliance on

the non-medical state evaluation.  Nor can the Court conclude that the ALJ's

unsubstantiated rejection of significant restrictions offered by Dr. Sateia constitutes

---

[7]     All indications in the record are that the ALJ believed that the second this
PRFC was completed by a medical source.  In his opinion the ALJ refers to the PRFC as a
"medical evaluation," and the signature of the lay evaluator appears in a signature block
clearly marked for a medical consultant.  (Tr. 62.)  Other courts have noted that the use by
Missouri's DDS counselors of the form employed here and this signature practice creates
confusion for ALJs.  *Dewey*, 509 F.3d at 449; *Wyrick*, 2011 WL 2680719, at*1n.1.

substantial evidence to support the  RFC.  In the absence of such conclusions there is no substantial evidence to support the RFC, and the Court cannot properly reach the issues Plaintiff raises with respect to the sufficiency of the hypothetical question propounded to the VE.

## CONCLUSION

In sum, the Court concludes that the ALJ's RFC determination at step four was not supported by substantial evidence on the record as a whole because the ALJ rejected the only medical evidence on the record related to work-related functioning.  The ALJ's decision to discredit Dr. Sateia's opinion and his reliance upon the opinion of a non-medical state evaluator was error, and the denial of disability benefits is not supported by substantial evidence on the record as a whole.  Accordingly, and out of  "abundant deference to the ALJ," the Court will remand the case for further administrative proceedings.  *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000).

On remand, the Commissioner shall permit Plaintiff to augment the record with the inclusion of any additional medical evidence she wishes to submit.  The Commissioner may also wish to further develop the record by inquiring of a treating physician or obtaining a consultative medical evaluation from a medical source examiner with respect to the severity of Plaintiff's impairments, including neuropathy, and her projected work-related capabilities and limitations, including any limitation regarding Plaintiff's ability to concentrate.

25

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**REVERSED** and this cause **REMANDED** to the Commissioner for further proceedings

consistent with this Memorandum and Order.

A separate Judgment shall accompany this Memorandum and Order.

/s/ ***Audrey G. Fleissig***

AUDREY G. FLEISSIG

UNITED STATES DISTRICT JUDGE

Dated this 20th day of March, 2012.